UNITED STATES of America,
Plaintiff–Appellee,

v.

Patrick Wayde MEALY and Lance B.
Spotts, Defendants–Appellants.

Nos. 87–1600, 87–1640.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1988.

Decided July 1, 1988.

Joel Hirschhorn, Joel Hirschhorn, P.A., Miami, Fla., for defendants-appellants.

Michael C. Carr, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., Benton, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Following a jury trial, defendants Patrick Mealy and Lance Spotts were found guilty of conspiring to distribute more than 1,000 pounds of marijuana, in violation of 21 U.S. C. §§ 841(a)(1), 846 (1982).[1] The court sentenced Mealy to twelve years imprisonment and a special assessment of $50. Spotts received a sentence of eight years imprisonment and a special assessment of $50. The defendants appeal their convictions and sentences.

## I. FACTUAL BACKGROUND

Conrad Ingold ran an organization that bought and sold large quantities of marijuana between 1981 and 1986. Ingold's organization acquired marijuana from various distributors and sold it to customers in several states. One of Ingold's distributors was John Rhodes.

In 1983, Ingold purchased approximately 4,000 pounds of marijuana from Rhodes. Rhodes met two of Ingold's drivers, Clarence Massie and Clifford Rylands, and took them to a "stash house" outside of Alachua, Florida. The stash house was the residence of defendant Spotts. The testimony at trial indicated that defendant Mealy was present at the stash house during the sale of marijuana and discussed price and quantity with Rhodes and Ingold. Rylands testified that he paid Mealy for 1,000 pounds of the marijuana. Both Massie and Rylands picked up two different loads of marijuana at the stash house in 1983. On each occasion, Spotts helped the drivers load the marijuana into their trucks. The drivers then delivered the marijuana to Ingold's customers. One of these customers was Jerry Juenger, a resident of Millstadt, Illinois.

Ingold testified that between 1983 and 1986, he continued his operation, utilizing different distributors. Rhodes contacted Ingold about once a year to discuss additional shipments that Ingold might want to purchase. In 1985, Rhodes and defendant Mealy went to New Orleans to meet with Ingold and to discuss selling Ingold marijuana. During the meeting, Ingold got the impression that Mealy was Rhodes's source for marijuana because Mealy discussed prices relating to an expected shipment. That shipment apparently never came in.

In 1986, Ingold purchased another 4,000 pounds of marijuana from Mealy and Rhodes. Ingold went with two drivers, Rylands and Reid Barbor, to the stash house in Alachua to pick up the marijuana from Mealy and Rhodes. Ingold dealt with both Mealy and Rhodes in deciding on price and quantity. Mealy, Rhodes, Spotts, Ingold, and the two drivers all helped to load the marijuana onto Ingold's vehicles. Once again, part of the shipment—1,013 pounds —was to be delivered to Juenger.

---

**1.** Section 841 provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1) (1982).

Section 846 mandates: "Any person who ... conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the ... conspiracy." *Id.* § 846.

Unknown to Ingold, Juenger had entered into an agreement with the government. Juenger had consented to tape record conversations between himself and Ingold concerning the purchase of this load. In April 1986, the FBI videotaped Rylands delivering the 1,013 pounds of marijuana to Juenger and accepting $25,000 as a partial payment. Juenger and Ingold continued to have telephone conversations regarding additional payments and an additional, larger shipment of marijuana that Ingold was expecting.

On May 1, 1986, Rylands returned to collect more money from Juenger and was arrested. After Rylands agreed to cooperate with the government, he disclosed the location of the stash house.[2] The following day, authorities executed a search warrant at the Alachua house and arrested Spotts during the search. Among the items that the officers seized were bales of marijuana, bale wrappers, scales, and a police scanner tuned to the local narcotics law enforcement frequency.

Ingold was arrested on May 16, 1986, when he attempted to sell Juenger a trunkload of marijuana. Ingold then agreed to tape record his telephone conversations with Mealy and Rhodes. By telephone, Mealy and Ingold arranged to meet at the Court of Flaggs hotel in Orlando, Florida. Ingold was to check in under the name of Chris Morgan and bring Mealy a partial cash payment of $400,000 for the marijuana.

Ingold went to the hotel and checked in as arranged. Ingold then received three different phone calls from Mealy to discuss the exchange of money. When Mealy met Ingold in the parking lot of the hotel as they had arranged, Mealy was arrested.

## II. DISCUSSION

The defendants[3] seek to overturn their convictions on several grounds, and also argue that their sentences were based on inaccurate information. We will address each of their contentions in turn.

### A. Evidence Supporting a Single Conspiracy

The defendants claim that the government failed to prove a single ongoing conspiracy from 1983 through 1986, as charged in the indictment. The defendants maintain that the evidence adduced at trial tended to show two separate conspiracies to distribute marijuana, one in 1983 and one in 1986. The defendants contend that the fatal variance between the indictment and the proof at trial requires reversal.

■ In determining the sufficiency of the government's evidence, we must review all of the evidence and all reasonable inferences in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979); *United States v. Abayomi*, 820 F.2d 902, 905 (7th Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). An appellate court may overturn a verdict only when a rational jury could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Abayomi*, 820 F.2d at 905; *Redwine*, 715 F.2d at 319.

" 'A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.' " *Abayomi*, 820 F.2d at 905 (quoting *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981)). "In

---

**2.** Rylands also told the FBI agents that one of Ingold's drivers, Reid Barbor, was going to New Orleans to deliver money to Ingold. Acting on this information, the FBI arrested Barbor on May 15, 1986 and seized $240,000. Barbor subsequently agreed to cooperate with the government.

**3.** Before the trial began, counsel for the three co-defendants stated that they joined in all their co-counsel's objections during the course of the trial. Tr. at 103. Therefore, although counsel for defendant Mealy made many of the objections to the alleged errors raised on appeal, defendant Spotts has also properly preserved those claims for appeal.

order to establish the crime of conspiracy, the government must prove that there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, and that an overt act was committed in furtherance of the agreement by one of the co-conspirators." *United States v. Noble,* 754 F.2d 1324, 1328 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). Conspiracies are secretive by nature; thus, circumstantial evidence is often the sole proof of the existence of a conspiracy and the defendants' participation in the conspiracy. *Abayomi,* 820 F.2d at 905; *Hedman,* 630 F.2d at 1192. Therefore, "[t]he government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *Redwine,* 715 F.2d at 320.

The defendants argue that Ingold's organization was a typical "wheel" conspiracy, with Ingold as the hub of the wheel and his many suppliers, including Mealy and Rhodes, as the spokes. *See Kotteakos v. United States,* 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946); *United States v. Whaley,* 830 F.2d 1469, 1474–75 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Percival,* 756 F.2d 600, 606 (7th Cir.1985). In *Kotteakos,* the Supreme Court barred the government from trying thirty-six defendants as members of a single conspiracy when the only connection between the separate conspiracies was that one man participated in all the conspiracies. 328 U.S. at 773, 66 S.Ct. at 1252. The defendants obtained federal housing loans through a single broker on the basis of false and fraudulent information. The broker was the hub of the conspiracy, obtaining loans for separate groups. The different groups were independent of each other. The government conceded that the proof showed multiple conspiracies, rather than the one conspiracy charged in the indictment, so that the jury could not possibly have found a single conspiracy beyond

a reasonable doubt. The Court found that the variance between the proof at trial and the indictment was not harmless error because the evidence presented to the jury on the many separate conspiracies ran a great risk that the jury would unconsciously transfer guilt from one conspiracy to another. *Id.* at 774, 66 S.Ct. at 1252.

While this case presents a close factual call, we believe it is distinguishable from *Kotteakos.* The illegal transactions that occurred in this case were not as separate and distinct as the illegal loan transactions in *Kotteakos.* Here, rather than one man as a nexus between each transaction, we have Ingold's widespread network to distribute the marijuana that he purchased from numerous suppliers. Mealy worked with Rhodes, Spotts, Ingold, and Ingold's drivers to sell marijuana to Ingold, which Ingold then distributed to his customers. The fact that Mealy did not personally know Ingold's other suppliers or customers did not prevent Mealy from joining the overall conspiracy. "While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy." *United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969). *Accord Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947); *Hartford Accident & Indem. Co. v. Sullivan,* 846 F.2d 377, 383 (7th Cir.1988); *Noble,* 754 F.2d at 1328–29.

Likewise, we can distinguish *United States v. Varelli,* 407 F.2d 735 (7th Cir. 1969). In *Varelli,* the defendants conspired, on separate occasions, to hijack two trucks, one carrying Polaroid cameras and one carrying silver. The court distinguished a general agreement to hijack trucks and two separate agreements to hijack two specific trucks. The court explained that the conspirators "did not contemplate a series of hijackings in which all would partake. Rather, [each] hijacking represented a single transaction with a single purpose." *Id.* at 744.

■ This case, however, was an ongoing business with various people involved in different ways. Mealy and Rhodes clearly contemplated other sales of marijuana to Ingold whenever a shipment came in. This is evidenced by their periodic conversations with Ingold, in which they discussed possible future shipments. Rhodes and Mealy were both involved in the 1983 and 1986 sales of marijuana to Ingold. Ingold testified that both Rhodes and Mealy came to New Orleans in 1985 to meet with him. During this meeting, Mealy and Ingold discussed prices relating to a possible future sale of marijuana. Ingold testified that their conversation gave him the impression that Mealy was Rhodes's source for marijuana. In addition, Rhodes periodically talked to Ingold to inquire about the possibility of future marijuana transactions.[4] Thus, we believe the evidence supports the jury's finding that the defendants participated in an overall conspiracy to distribute marijuana, rather than two separate sales of marijuana. *See United States v. Urbanik*, 801 F.2d 692, 696 (4th Cir.1986) ("The principals may have performed their roles at different points in the distribution network, but the evidence suffice[d] to support the inference of a single large conspiracy the object of which was the wide-scale possession and distribution of marijuana and cocaine.").

Even if we accepted Mealy's argument that no substantive evidence linked Mealy to the conversations between Ingold and Rhodes, we believe that the other evidence is sufficient to support the jury's finding that Mealy was involved in the single conspiracy. " 'As long as the conspiracy continued and its goal is to achieve a common objective, ... parties may still be found guilty even though they join or terminate their relationship with the core conspira-

tors at different times.' " *United States v. Davis*, 838 F.2d 909, 913 (7th Cir.1988) (quoting *Noble*, 754 F.2d at 1329). *Accord Varelli*, 407 F.2d at 742. The common objective here was the distribution of large quantities of marijuana. The testimony at trial linked Mealy to transactions in 1983 and 1986. In addition, the jury heard testimony that Mealy traveled to New Orleans in 1985 to discuss another possible marijuana sale. The fact that the evidence did not show any actions by Mealy to distribute marijuana in 1984 does not prevent a finding that he was part of the single ongoing conspiracy. As we found in *Davis*, "[t]he fact that some individuals involved in the conspiracy may not have been continuously involved with the enterprise simply does not negate the existence of a single conspiracy." 838 F.2d at 914. *Accord Whaley*, 830 F.2d at 1474–75; *Noble*, 754 F.2d at 1328–29. *See also United States v. Balistrieri*, 779 F.2d 1191, 1213 (7th Cir.1985).

As for defendant Spotts, the evidence relating to his part in the single conspiracy to distribute marijuana is even stronger. Spotts lived in the Alachua stash house from 1983 until 1986. In addition, the testimony at trial indicated that in 1983, 1984, and 1986, Spotts helped Ingold's drivers load their trucks with marijuana that had been stored in the house. Finally, Spotts was arrested at the Alachua stash house, where officers seized drugs and drug paraphernalia. From this evidence, the jury could reasonably infer that Spotts had entered into an agreement to help distribute marijuana. *See United States v. Alvarez*, 833 F.2d 724, 728 (7th Cir.1987) (" 'Even without personal communication, tacit understanding of the usual business arrangements through a long course of conduct between the parties is enough to constitute an agreement.' ") (quoting *United*

---

**4.** Contrary to the defendants' assertion, we cannot characterize these inquiries about future marijuana shipments as mere idle conversation. The defendants cite *United States v. Urbanik*, 801 F.2d 692 (4th Cir.1986), to support their argument. *Urbanik*, however, involved a quite different situation. In that case, a marijuana distributor identified Urbanik as his supplier during a casual conversation while weight-lifting with another man. The court found that the

"statement [could] fairly be treated only as the sort of idle conversation which though it touches upon, does not 'further,' a conspiracy." *Id.* at 698. Here, however, Rhodes testified that he kept in contact with Ingold about once a year to discuss future marijuana shipments. Their conversations, unlike the one in *Urbanik*, had a primary purpose of furthering the conspiracy. Therefore, the *Urbanik* rationale does not apply to these conversations.

*States v. Reynolds,* 801 F.2d 952, 954 (7th Cir.1986)); *Noble,* 754 F.2d at 1329 (conspirator need not participate in every facet of the conspiracy). Thus, the evidence at trial was sufficient to support the jury's finding that Spotts was part of the single ongoing conspiracy. *See Davis,* 838 F.2d at 912–14 (stash house operator was part of a single ongoing conspiracy to distribute marijuana). Viewing the evidence in the light most favorable to the government, we believe that the evidence supports the jury's finding of a single ongoing conspiracy involving both defendants.

■ Finally, we note that the jury was instructed on the defendants' defense of multiple conspiracies.[5] "If the jury is properly instructed, the finding of a single conspiracy must stand unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury so to find." *Urbanik,* 801 F.2d at 695; *accord Percival,* 756 F.2d at 609; *Varelli,* 407 F.2d at 747. The jury in this case, although properly instructed on the possible existence of multiple conspiracies, nevertheless found that the defendants had knowledge of and were involved in a single conspiracy. This was a fact question uniquely within the province of the jury, and was supported by sufficient evidence. Therefore, we will not overturn the jury's verdict.[6]

### B. *Admissibility of Evidence*

The defendants argue that the trial judge erroneously admitted into evidence the plea agreements of government witnesses and certain statements by co-conspirators. The defendants contend that, as a result of these erroneous evidentiary rulings, they were denied their rights to due process of law and a fair and impartial trial.

■ A reviewing court may overrule a trial court's evidentiary rulings only if the trial court abused its discretion. *United States v. Kaden,* 819 F.2d 813, 818 (7th Cir.1987); *United States v. Swiatek,* 819 F.2d 721, 726 (7th Cir.), *cert. denied,* ——U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). We find that the trial judge did not abuse his discretion in admitting the plea agreements and co-conspirator statements, and thus did not deprive the defendants of their rights to due process and a fair and impartial trial.

### 1. Plea Agreements

Five government witnesses were unindicted co-conspirators who had agreed to plead guilty to the same or similar charges as the defendants. The defendants contend that the trial judge erred in admitting the five witnesses' plea agreements into evidence because the plea agreements referred to the witnesses' promises to provide truthful testimony. The defendants claim that admission of the plea agreements allowed the government to improperly bolster the credibility of these witnesses.

■ The government may not bolster the credibility of its witnesses in advance. *United States v. LeFevour,* 798 F.2d 977, 983 (7th Cir.1986); *see* Fed.R.Evid. 608(a)(2) ("evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked"). Nevertheless, this circuit has recognized

5. The judge gave the following instruction, as suggested by defendant Mealy:

Defendants contend that although charged in a conspiracy, their acts and conduct do not fall within the charge contained in the Indictment which alleges one single, overall conspiracy between the years 1983 and 1986, and involving the several people named in the Indictment. Defendants contend that they had no knowledge of the single overall conspiracy charged in the Indictment. If you find that the Defendants did not participate in and have knowledge of the one single, overall conspiracy charged in the Indictment, then the Defendants must be found not guilty, even though you may believe that they engaged in unlawful conduct in 1983 and 1986.
Record at 125.

6. We note that even if we were to assume that the evidence produced at trial could not support the finding of a single conspiracy, reversal would not be automatic. The defendants not only must show a variance between the proof at trial and the indictment, they must also show that the variance was prejudicial. *See Percival,* 756 F.2d at 609 n. 3; *Noble,* 754 F.2d at 1330; *see also Berger v. United States,* 295 U.S. 78, 81–84, 55 S.Ct. 629, 630–31, 79 L.Ed. 1314 (1935).

that "asking a witness whether he is testifying by agreement is not likely to bolster his credibility. If anything it is likely to have the opposite effect, by imputing a motive for the witness's testifying as the prosecution wants him to testify, regardless of the truth." *LeFevour*, 798 F.2d at 983; *accord United States v. Townsend*, 796 F.2d 158, 163 (6th Cir.1986).

■■■ The well-established rule in this circuit is that, on direct examination, the prosecutor may elicit testimony regarding the witness's plea agreement and actually introduce the plea agreement into evidence. *See United States v. Machi*, 811 F.2d 991, 1003 (7th Cir.1987); *LeFevour*, 798 F.2d at 983–84; *United States v. Hedman*, 630 F.2d 1184, 1198–99 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed. 2d 614 (1981); *United States v. Craig*, 573 F.2d 513, 519 (7th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978); *United States v. Creamer*, 555 F.2d 612, 617–18 (7th Cir.), *cert. denied*, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977); *United States v. Isaacs*, 493 F.2d 1124, 1165 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).[7] The defendants do not dispute that the government properly elicited testimony regarding the plea agreements in this case. Rather, the defendants argue that introducing these particular plea agreements into evidence was prejudicial because of the numerous references to truthful testimony. Five plea agreements were admitted into evidence, each containing four or five references to the witness's obligation to provide truthful testimony.

While most of the authority on this subject deals with the proper scope of direct examination by the prosecutor, in *Machi* this court found that the trial court did not commit error in allowing a witness to read his entire plea agreement into the record. 811 F.2d at 1002–04. *See also LeFevour*, 798 F.2d at 984 (evidence was so overwhelming that any error in the admission of the plea agreements was harmless). Introducing the entire plea agreement into evidence may enable the jury to assess the witness's credibility and motivations more accurately than simply eliciting testimony about the plea agreement. *Townsend*, 796 F.2d at 163 (citing *Craig*, 573 F.2d at 519). In fact, "[w]hile the existence of a plea agreement may support the witness' credibility by showing his or her interest in testifying truthfully, the plea agreement may also impeach the witness' credibility by showing his or her interest in testifying as the government wishes regardless of the truth." *Townsend*, 796 F.2d at 163. In addition, if the government did not introduce the actual plea agreement into evidence, the defendant could argue convincingly to the jury that the government or its witness has something to hide. *United States v. Hilton*, 772 F.2d 783, 787 (11th Cir.1985); *United States v. Halbert*, 640 F.2d 1000, 1005 (9th Cir.1981).

The plea agreements in this case were five pages in length, and each contained four or five references to the witness's promise to testify truthfully.[8] In drafting plea agreements, the government should avoid unnecessarily repetitive references to truthfulness if it wishes to introduce the agreements into evidence. Nevertheless, we do not believe that the plea agreements

7. Other circuits follow this rule as well. *See, e.g., Townsend*, 796 F.2d at 163; *United States v. Leslie*, 759 F.2d 366, 376 (5th Cir.1985), *rev'd on rehearing in banc on other grounds*, 783 F.2d 541, 542 n. 1 (5th Cir.1986); *United States v. McNeill*, 728 F.2d 5, 14 (1st Cir.1984); *United States v. Henderson*, 717 F.2d 135, 138 (4th Cir. 1983), *cert. denied*, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984).

8. The five references to truthful testimony in the plea agreements pertained to the following topics: (1) the defendant agreed to provide information regarding the charged violations, including testimony before grand juries or providing information to federal or state law enforcement agencies; (2) the defendant agreed to provide information regarding any other criminal activity known to the defendant; (3) the defendant agreed to testify before any grand jury or at any trial, under penalty of perjury; (4) the defendant acknowledged that if he does not testify truthfully, he is subject to prosecution for any crime known to the government; (5) the defendant agreed to provide testimony and information to facilitate the government's seizure of all assets or proceeds obtained by him in violation of the Controlled Substances Act.

in this case disproportionately emphasized or repeated the promise of truthful testimony. *See United States v. Henderson,* 717 F.2d 135, 138 (4th Cir.1983), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *Halbert,* 640 F.2d at 1005. In any case, the judge's instruction[9] to the jury that they should use caution in evaluating the government witnesses' testimony was sufficient to dispel any harmful effects of the references to truthful testimony.

▆▆▆ The defendants also claim that the prosecutor improperly vouched for the credibility of the witnesses. In introducing evidence of plea agreements, the prosecutor may not imply that he possessed information not heard by the jury on the issue of the immunized witness's veracity. *Hedman,* 630 F.2d at 1198–99; *Craig,* 573 F.2d at 519; *Creamer,* 555 F.2d at 617. Nor can the prosecutor express or imply his personal opinion that a witness is telling the truth. *Creamer,* 555 F.2d at 617. The prosecutor in this case did neither. The prosecutor merely asked the witnesses to state their understanding of the plea agreements they had entered into with the government. We have previously upheld this line of inquiry. *LeFevour,* 798 F.2d at 983–84; *Craig,* 573 F.2d at 519. *See also United States v. Winter,* 663 F.2d 1120, 1133–34 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983).

▆▆▆ The defendants, however, point to two statements by the prosecutor in his closing argument: "We brought you those people to testify."; and "I'm confident that you'll agree that these individuals are all involved in the same conspiracy...." Tr. at 903; Excerpt of Closing Arguments at 31. The second statement is merely a summary of the government's theory of the case. We do not believe that that statement impermissibly expresses the prosecutor's opinion as to the witnesses' veracity. The first statement is equally equivocal. Nevertheless, even if the jury could infer from these statements that the prosecutor personally believed that the government witnesses were telling the truth, the error would be harmless. The judge specifically instructed the jury that they should consider the testimony of the government witnesses with caution and great care. *See supra* note 9. The instruction was sufficient to dispel any possible inference that the government could vouch for the witnesses' veracity. *See Machi,* 811 F.2d at 1004; *Hedman,* 630 F.2d at 1199; *see also Henderson,* 717 F.2d at 138.

## 2. Co-conspirator Statements

As each of four unindicted co-conspirators were arrested, they agreed to cooperate with the government by secretly recording telephone conversations with other members of the conspiracy. These taped conversations were admitted into evidence.[10] The defendants claim that these conversations were inadmissible hearsay. Under the Federal Rules of Evidence, a statement is not hearsay if it is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). The defendants argue that the conversations could not have been in furtherance of the conspiracy because, in each conversation, one of the parties was a government informant. The defendants rely on the principle that "a person cannot conspire with a government informer who secretly intends to frustrate the conspiracy." *United States v. Lively,* 803 F.2d 1124, 1126 (11th Cir.1986); *see*

---

**9.** The judge instructed the jury:

> The witnesses, Clarence Massie, Clifford Rylands, Jerry Juenger, Conrad Ingold and Robert Barbor, have agreed to plead guilty to a crime arising out of the same occurrence for which the defendants are now on trial. These witnesses have received immunity from prosecution for other crimes; that is a promise by the government that any testimony or other information they provided would not be used against them in a criminal case. You may give their testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care. Moreover, their guilty plea is not to be considered as evidence against the defendants. Record at 125.

**10.** In addition, videotapes of Rylands delivering marijuana to Juenger and Rylands's subsequent arrest were introduced at trial.

*Sears v. United States,* 343 F.2d 139, 142 (5th Cir.1965).

 A co-conspirator's arrest does not automatically terminate a conspiracy; the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of their partners. *United States v. Papia,* 560 F.2d 827, 835 (7th Cir.1977); *United States v. Thompson,* 476 F.2d 1196, 1200 (7th Cir.), *cert. denied,* 414 U.S. 918, 94 S.Ct. 214, 38 L.Ed.2d 154 (1973). In a case with facts very similar to those before us, the Sixth Circuit held:

> [W]here, as here, the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting "under the direction and surveillance of government agents to obtain evidence against the coconspirators".

*United States v. Hamilton,* 689 F.2d 1262, 1269 (6th Cir.1982) (quoting *United States v. Thompson,* 533 F.2d 1006, 1010 (6th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976)), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). *Accord United States v. Lewis,* 759 F.2d 1316, 1348 (8th Cir.), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *Papia,* 560 F.2d at 835–36; *United States v. Craig,* 573 F.2d 455, 477 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978). Thus, the fact that one party to the conversation was a government informant does not preclude the admission of the conspirator's statements under Rule 801(d)(2)(E).

 The conversations in issue dealt with such topics as selling the marijuana, arranging delivery and payment, reassuring each other of trustworthiness, and discussing the current status of the conspiracy and the government's investigation. Clearly, the statements by the unarrested conspirators were made in furtherance of the conspiracy and thus were admissible under Rule 801(d)(2)(E).

 Finally, the defendants argue that even if these conversations were admissible under Rule 801(d)(2)(E), the court should have excluded them as unduly prejudicial. The Federal Rules of Evidence provide that evidence should be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R. Evid. 403. The conversations indicated that the conspiracy to distribute marijuana was in existence and that its members were still actively involved in acquiring and selling marijuana. Because the government presented ample independent evidence of the existence of the conspiracy and the involvement of the defendants in that conspiracy, the statements did not unfairly link the defendants to the conspiracy. Thus, the judge did not abuse his discretion in admitting the conversations into evidence.

## C. Alleged Judicial Errors

The defendants claim that, as a result of certain errors by the trial judge, they were denied their rights to due process of law and a fair and impartial trial. We affirm the district court's rulings.

### 1. District Court's Failure to Answer the Jury's Question

The defendants claim that the trial court failed to properly respond to the jury's question. During deliberation, the jury sent the following question to the judge:

> We need to clarify overall conspiracy *Between* the years 1983 and 1986. Does this mean the defendents [sic] (each) (or) had to be continuing conspiring during all this time, like contact in 1984 and 1985. Also Does *Between* mean the same as *Thru.*

Record at 122. The district judge responded: "It is suggested you read all the conspiracy instructions as a whole and rely on your collective recollections of the facts." *Id.* The judge declined the defendants' request to give the jury the dictionary definition of "between."

 We have repeatedly held that it is within the trial court's discretion to decide what supplemental instructions to give to a

deliberating jury that seeks clarification of the law. *United States v. Zabic,* 745 F.2d 464, 475 (7th Cir.1984); *Davis v. Greer,* 675 F.2d 141, 145 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Papia,* 560 F.2d 827, 843 (7th Cir.1977); *United States v. Castenada,* 555 F.2d 605, 611 (7th Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977); *United States v. Braverman,* 522 F.2d 218, 224 (7th Cir.), *cert. denied,* 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed. 2d 302 (1975). If the original jury charge clearly and correctly states the applicable law, the judge may properly answer the jury's question by instructing the jury to reread the instructions. *Davis,* 675 F.2d at 145–46; *Papia,* 560 F.2d at 843; *Castenada,* 555 F.2d at 611. Because the defendants did not challenge the correctness of the instructions that the jury received, it was within the judge's discretion to direct the jury to reread the original instructions rather than giving the jury the dictionary definition of "between" as the defendants had requested. *United States v. Lang,* 644 F.2d 1232, 1239 (7th Cir.), *cert. denied,* 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981). Thus, we find that the court did not abuse its discretion in referring the jury to the original instructions which correctly and clearly stated the law. *See supra* note 5 (quoting the relevant jury instruction).

2. District Court's Failure to Declare a Mistrial

During direct examination of Jerry Juenger, a government witness, the prosecutor asked Juenger whether a co-conspirator, C.J. Rylands, was also a cooperating witness. Juenger replied that "[h]e was not under protection at that time, no." Counsel for defendant Mealy objected to Juenger's answer and moved for a mistrial on the grounds that the phrase "under protection" suggested that Rylands had been exposed to some sort of danger. The court sustained the objection and ordered the jury to disregard the comment. The court denied the motion for a mistrial. The de-

fendants claim that the comment so prejudiced them that they could not receive a fair trial, and thus the district court should have declared a mistrial.

Juenger's comment regarding protection was misleading. None of the witnesses involved in this case were placed in the federal witness protection program. Juenger probably meant to say that Rylands had not yet agreed to cooperate with the government. Nevertheless, the jurors conceivably might have assumed that Rylands needed protection because he was serving as a witness against the defendants. The risk of this faulty assumption, however, was slight. No evidence was presented at trial of threats or intimidation against any of the witnesses.[11] Nevertheless, the trial court sustained the objection and promptly gave the jury a cautionary instruction to disregard Juenger's comment about Rylands being under protection.

▪ A trial judge has broad discretion in deciding whether, in the context of the entire trial, a defendant's motion for a mistrial should be granted. We will not reverse the trial court's decision unless it was an abuse of discretion. *United States v. Fulk,* 816 F.2d 1202, 1205 (7th Cir.1987); *United States v. D'Antonio,* 801 F.2d 979, 983 (7th Cir.1986); *United States v. Phillips,* 640 F.2d 87, 91 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981). In deciding whether the court abused its discretion, we must keep in mind that a trial judge is often in the best position to determine whether an incident was so serious as to warrant a mistrial. *United States v. Liefer,* 778 F.2d 1236, 1245–46 (7th Cir.1985).

▪ We have previously upheld a trial court's exercise of discretion in issuing a cautionary instruction, rather than declaring a mistrial, to cure any potential prejudice. *See Fulk,* 816 F.2d at 1205–06; *Liefer,* 778 F.2d at 1246; *United States v. Torres,* 733 F.2d 449, 462 (7th Cir.), *cert. denied,* 469 U.S. 864, 105 S.Ct. 204, 83 L.Ed.2d 135 (1984); *Phillips,* 640 F.2d at

---

**11.** The only evidence of any threat was a taped conversation between Rhodes and Ingold in

which Rhodes indicated that Mealy was being threatened by his suppliers for not paying them.

91; *but see United States v. Boroni,* 758 F.2d 222, 225 (7th Cir.1985) (instruction insufficient to dispel prejudice where the verdict was substantially affected by the erroneously admitted evidence of prior bad acts). We generally must assume that the jury followed the court's cautionary instructions. *Fulk,* 816 F.2d at 1205; *Phillips,* 640 F.2d at 91.

■ Considering the improper testimony in the context of the entire trial, we find that any potential prejudicial effect of Juenger's comment was insignificant in light of the overwhelming evidence of the defendants' guilt. *Torres,* 733 F.2d at 461–62; *Phillips,* 640 F.2d at 92. The trial court did not abuse its discretion in denying the defendants' motion for a mistrial.

*D. Prosecutorial Misconduct*

The defendants next assert that they were denied a fair trial and due process of law due to numerous instances of prosecutorial misconduct. In analyzing claims of prosecutorial misconduct, we must first ascertain whether the challenged remark or conduct was actually improper. *United States v. Swiatek,* 819 F.2d 721, 730 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). The Supreme Court has instructed that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Therefore, even if the prosecutor engaged in improper conduct, we must "reexamine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair

trial." *Swiatek,* 819 F.2d at 730; *see United States v. Mazzone,* 782 F.2d 757, 763 (7th Cir.), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986).

■ One instance of claimed improper conduct by the prosecutor occurred during closing argument, at the beginning of the government's rebuttal. Referring to the collapsible pointer that counsel for defendant Mealy had used during his closing argument, the Assistant United States Attorney stated that defense counsel had apparently broken the antenna off of someone's car. Defense counsel, seeing little humor in the remark, immediately objected to the government's insinuation that he had committed a criminal act, and the court properly instructed the jury to disregard the remark.[12]

We will give substantial weight to a district court's determination that a prosecutor's misconduct did not affect the trial. As we have previously noted, the trial judge "was able to observe the jury and thus gauge the probable impact on it of the prosecutor's remarks and of his own admonitions, and we are not." *Mazzone,* 782 F.2d at 763; *see United States v. West,* 670 F.2d 675, 690 (7th Cir.), *cert. denied,* 457 U.S. 1124, 1139, 102 S.Ct. 2944, 2972, 73 L.Ed.2d 1340, 1359 (1982) (two petitions for certiorari denied). In addition to the district court's finding that the defendants had received a fair trial, we also rely on the overwhelming evidence of guilt presented against the defendants. Thus, our observations in *Mazzone* are equally applicable here:

It is almost inconceivable that if the prosecutor had refrained from making the remarks that he did, the appellants would have been acquitted. It is more likely that the judge's admonitions re-

---

12. The incident occurred at the beginning of the Assistant United States Attorney's closing argument:

MR. CARR: You certainly can do something about what happened in this courtroom and the manner in which we prosecute. First of all, you can take this person that's talked about Barnum and Bailey that has broken the antenna off of somebody's car wherever it's from, that has some ...

MR. HIRSCHHORN: I object. That infers that I might have committed a criminal act.
MR. CARR: I'm sorry, is that what it is?
MR. HIRSCHHORN: It's a collapsable [sic] pointer which can be purchased for two dollars anywhere. I demand that it be stricken.
MR. CARR: It's a collapsable [sic] pointer.
THE COURT: I ask the jury, they are instructed to disregard that comment.
Excerpt of Closing Arguments at 22.

duced the stature of the assistant U.S. attorney in the jury's eyes than that the remarks that were admonished swayed the jury.

782 F.2d at 764.

Finally, we note that the defense counsel's references to the Assistant United States Attorney as the "master of the show" with many props available to him and the government's presentation as a "stage production" may have invoked the "invited response" doctrine. *Swiatek,* 819 F.2d at 730. That doctrine does not condone improper remarks by the prosecutor in retaliation for improprieties by the defense, but rather "merely recognizes that the impact on the defendant from the prosecutor's misbehavior may be less if the defendant's counsel aroused the jury against the prosecutor." *Mazzone,* 782 F.2d at 763. Therefore, we find that the prosecutor's remarks, in any event, were not reversible error given the judge's prompt curative instruction, the overwhelming evidence of the defendants' guilt, and the provocative remarks by defense counsel.

Likewise, the other examples of prosecutorial misconduct that the defendants point to do not constitute reversible error. We have already rejected the defendants' argument that the prosecutor committed reversible error by making personal comments regarding the veracity of the government's witnesses. *See supra* Section II.B.1.

■ The defendants also claim that the prosecutor implied that the defendants and/or defense counsel were untrustworthy when the prosecutor objected to the defense taking a certain piece of evidence to the counsel table. The record reflects that this objection was made at a side bar out of the hearing of the jury. The court then took a recess, during which the defense was able to examine the evidence. We do not believe that the prosecutor committed any error in this instance.

■ Finally, the defendants claim that the prosecutor wrongly accused defense counsel of making improper and untrue statements of law. In fact, the court did sustain at least one objection to an improper statement of the law by the defense. In the instance the defendants complain of, however, the court read aloud the statute in question and admonished the jury to disregard the comments of counsel made during the objections. We find that this curative instruction was sufficient to dispel any error.

We have examined all of the other alleged instances of prosecutorial misconduct, but find them to be without merit. We must view any errors by the prosecutor in the context of the entire trial, which lasted seven days. *Young,* 470 U.S. at 11, 105 S.Ct. at 1044; *Mazzone,* 782 F.2d at 764; *Rose v. Duckworth,* 769 F.2d 402, 405 (7th Cir.1985). Because the trial court admonished the jury to disregard the improper remarks and the government presented overwhelming evidence of the defendants' guilt, we do not believe that any improper remarks by the prosecutor, independently or cumulatively, constituted reversible error.

It should not be necessary for us to remind counsel that both prosecutors and defense counsel have an ethical obligation to refrain from personal attacks on opposing counsel. *Young,* 470 U.S. at 9–10, 105 S.Ct. at 1043–44. Instead of citing relevant case law and discussing the legal standards, the government spent several pages of its brief giving examples of defense counsel's personal attacks on the Assistant United States Attorney in an attempt to justify the prosecutor's remarks. In *Mazzone,* some good advice was given to United States Attorneys:

> The federal government's lawyers may not fight fire with fire. If defense counsel exceed proper bounds in their closing arguments, the prosecutor can object; he can, if need be, ask that counsel be held in contempt for improper argument or questions ...; but he cannot respond in kind and violate ethical standards himself.

782 F.2d at 762–63.

### E. Sentencing

The defendants next claim that the court erred in finding, for sentencing purposes,

that the defendants were parties to a conspiracy involving more than 20,000 pounds of marijuana. The presentence investigation report lists the quantity of marijuana that the defendant was accountable for; an amount in excess of 20,000 pounds will delay a defendant's eligibility for parole. *See* 28 C.F.R. § 2.20, at 99 (1987). The defendants contend that the evidence supporting the court's findings was factually and legally insufficient. The defendants therefore request that their cases be remanded for resentencing and that any reference to the inflated amount of marijuana be stricken from the presentence investigation report.

■ Our review of a district court's sentencing decision is very narrow; we may overturn a sentence only if the court committed an abuse of discretion.[13] *United States v. Ray*, 828 F.2d 399, 425 (7th Cir.1987), *cert. denied,* —— U.S. ——, ——, 108 S.Ct. 781, 1233, 98 L.Ed.2d 867, 99 L.Ed.2d 432 (1988) (three petitions for certiorari denied); *United States v. Mischler*, 787 F.2d 240, 247 (7th Cir.1986). "[A] criminal defendant has a constitutional right to be sentenced on accurate information, and this court will vacate a sentence if the district court relied on improper factors." *United States v. Cusenza*, 749 F.2d 473, 478 (7th Cir.1984) (citations omitted).

After the defendants contested the amount of marijuana involved in the conspiracy, the court delayed sentencing so that an evidentiary hearing could be held, in accordance with Rule 32.[14] Both sides were allowed to present testimony and other evidence, as well as cross-examine witnesses. After hearing the evidence, the court made a finding that the conspiracy involved 20,950 to 22,750 pounds of marijuana. It is that finding that the defendants claim was an abuse of discretion.

The first source of error that the defendants point to is the testimony of Massie and Rylands, two of Ingold's drivers, at the sentencing hearing. Massie testified that in 1983 he made two trips to the Alachua stash house to pick up marijuana. On his first trip, he picked up 1,000 pounds and saw an additional 1,000 pounds. On his second trip, a week to ten days later, he picked up 1,000 pounds of marijuana and saw an additional 500 to 600 pounds. Similarly, Rylands testified to two trips he made to the stash house in 1983. On Rylands's first trip, he picked up 1,000 pounds of marijuana and saw an additional 1,000 pounds. On his second trip, which occurred a few days later, Rylands picked up 1,000 pounds and saw another 800 to 1,000 pounds. While neither Massie nor Rylands testified to the exact dates of their visits to the stash house, both stated that their visits occurred in the spring of 1983. Massie

**13.** For defendants sentenced under the new sentencing guidelines, which took effect November 1, 1987, a new standard of review will apply:

> Upon review of the record, the court of appeals shall determine whether the sentence—
> (1) was imposed in violation of law;
> (2) was imposed as a result of an incorrect application of the sentencing guidelines;
> (3) is outside the range of the applicable sentencing guideline, and is unreasonable, having regard for—
> (A) the factors to be considered in imposing a sentence, as set forth in chapter 227 of this title; and
> (B) the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or
> (4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.
> The court of appeals shall give due regard to the opportunity of the district court to

judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous.

18 U.S.C.A. § 3771 (West Supp.1988).

**14.** Rule 32 reads:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

Fed.R.Crim.P. 32(c)(3)(D).

apparently picked up his loads before Rylands, although none of their trips coincided.

The court included all the marijuana either picked up or observed by Massie and Rylands in 1983 in arriving at the total amount of marijuana involved in the conspiracy. The defendants, however, contend that the court's method allowed double counting. The defendants point out that, because the four trips to the stash house all occurred about the same time, it is likely that the marijuana observed by one driver during his first trip was the same marijuana that either he or the other driver picked up on a later trip. Thus, the defendants suggest that the court at least should not have counted the amounts observed by Massie and Rylands on their first trips in 1983.

We concede that it is possible that the marijuana seen by one driver was picked up by the other driver. The district court, however, rejected this argument at the sentencing hearing. As the government points out, one driver was not merely picking up what the other driver had left, because the amounts do not coincide. While Massie and Rylands both testified that only 1,000 pounds was left after their first trips, every time they arrived to pick up marijuana, there was always more than 1,000 pounds in the stash house. The judge heard the evidence both at trial and at the sentencing hearing, and provided the defendants with an opportunity to present their views and rebut the testimony relied on by the district court. *See Cusenza,* 749 F.2d at 479 ("Because the testimony consisted mainly of first-hand observations, allowing defense counsel to cross-examine [the witness] and allowing defendant to comment on the evidence provided an adequate opportunity to expose weaknesses in [the witness's] testimony."). This was a difficult factual issue, and we will not substitute our own determination for that of the trial judge. *See Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948).

Massie's testimony troubles the defendants for another reason. At trial, Massie testified that he picked up 700 to 800 pounds of marijuana on each trip he made to the Alachua stash house in 1983. At the sentencing hearing, however, Massie upped his estimate to 1,000 pounds per trip. The defendants protest that the court should have counted only the amounts that Massie testified to at trial, not the greater quantities that he testified to at the sentencing hearing.

Once again, the trial judge was in the best position to weigh the testimony of the witness both at trial and at the sentencing hearing. Although the defendants cross-examined Massie at the sentencing hearing, they did not question his testimony as to the exact amounts he picked up nor did they use his trial testimony to impeach him. Because the defendants did not point out this discrepancy in Massie's testimony to the trial court, they cannot now raise it. *First Interstate Bank v. Chapman & Cutler,* 837 F.2d 775, 781 (7th Cir.1988); *Farnum v. United States,* 813 F.2d 114, 116 (7th Cir.1987) (per curiam). Nonetheless, we do not believe the trial court erred in relying on Massie's testimony at the sentencing hearing. At trial, Ingold testified that in 1983 he purchased about 4,000 pounds of marijuana from Rhodes. He sent Massie and Rylands to the Alachua stash house to pick up the 4,000 pounds in four separate loads. Thus, Ingold's trial testimony corroborates Massie's testimony at sentencing that he picked up two loads of 1,000 pounds each. *See United States v. Catch The Bear,* 727 F.2d 759, 761 (8th Cir.1984) (factual matters can be considered as a basis for the sentence if they have some minimal indicium of reliability beyond mere allegation); *see also United States v. Petitto,* 767 F.2d 607, 611 (9th Cir.1985). In any event, we note that the possible difference of 600 pounds would not lower the total quantity of marijuana involved in the conspiracy below the 20,000–pound threshold, and therefore any error was harmless.

Next, the defendants contest the court's inclusion of an 8,000– to 9,000–pound shipment of marijuana attributed to Mealy. Rylands testified at the sentencing hearing that when he was picking up the second

load of marijuana in April 1986, Mealy told him that, in a week or so, he expected to get "eight or nine thousand more." Spotts was present during this conversation, although he did not participate in it. Reference to this shipment was also made in a videotaped conversation between Rylands and Juenger that was introduced at trial. The defendants argue that any amounts that might have been acquired in the future are too speculative to be considered for sentencing purposes.

■ "[T]here are few limitations on the type of information a district court can consider when sentencing a defendant." *Cusenza*, 749 F.2d at 478. A district court may consider hearsay evidence in sentencing a defendant, so long as the defendant is afforded an opportunity to rebut the evidence. *Id.* Rylands testified to the conversation both at trial and at the sentencing hearing, and the defendants were allowed to cross-examine him on both occasions. Therefore, the court could properly consider this testimony for sentencing purposes.

■ Finally, the defendants complain that the district court failed to reduce the total amount of marijuana by the weight of the burlap bags in which it was wrapped. The defendants failed to raise this issue before the district court; therefore, we will not consider it. *First Interstate Bank*, 837 F.2d at 781; *Farnum*, 813 F.2d at 116.

■ The court's finding that the conspiracy involved over 20,000 pounds of marijuana was supported by the evidence presented both at trial and at the sentencing hearing. Therefore, the court did not abuse its discretion in sentencing the defendants.

### F. Issues Pertaining to Defendant Spotts

Defendant Spotts raises two additional arguments in his own behalf. Spotts claims that the district court erroneously failed to suppress evidence obtained by the police and FBI when they executed a search warrant at the Alachua stash house. Spotts also claims that he was denied his sixth amendment right to effective assistance of counsel at trial.

### 1. Suppression of Evidence

Spotts contends that the authorities searched his residence, the Alachua stash house, in violation of a Florida law that requires officers serving a search warrant to "knock and announce" before entering the premises to be searched. *See* Fla.Stat. §§ 901.19(1), 933.09 (1986). Spotts sought to have the district court suppress the evidence that the officers seized during that search. Upon Spotts's motion, the district court held a suppression hearing on that issue. At the hearing, Spotts testified that the officers did not knock and announce before entering the house. The district court denied Spotts's motion to suppress the evidence.

■ In a federal criminal prosecution, federal standards govern the admissibility of evidence. *See Wolfle v. United States*, 291 U.S. 7, 12–13, 54 S.Ct. 279, 279–80, 78 L.Ed. 617 (1934); *United States v. Dudek*, 530 F.2d 684, 689 (6th Cir.1976). In determining whether evidence seized by state officials may be used against a defendant in a federal proceeding, the district court must determine the legality of the search and seizure as if federal officers had executed the search and seizure. *Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964); *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). Thus, the fact that the officers failed to comply with Florida law is irrelevant in a federal proceeding.

■ We recognize that federal law requires federal officials executing a search warrant to first knock and announce their authority and purpose before entering a dwelling. *Sabbath v. United States*, 391 U.S. 585, 590, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968) (construing 18 U.S.C. § 3109); *cf. United States v. Salter*, 815 F.2d 1150, 1152 (7th Cir.1987). Thus, even under federal law, the authorities executing the search warrant at the Alachua stash house were required to knock and announce before entering the house. In

his motion to suppress before the district court, however, Spotts relied solely on Florida law, without reference to federal law. Likewise, in his brief, Spotts merely cites the Florida statute, and does not mention the federal knock and announce requirement.[15] Therefore, we will not consider whether the officers complied with the federal knock and announce requirement. *United States v. Whaley*, 830 F.2d 1469, 1475–76 (7th Cir.1987) (arguments not presented to district court are waived for purposes of appeal), *cert. denied*, —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *see Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir.1987) ("appellate court ought not put words in a party's mouth and use them as the grounds on which to decide"), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). We see no reason to disagree with the determination of the trial judge.

### 2. Ineffective Assistance of Counsel

Spotts also argues that he did not receive effective assistance of counsel at trial. Spotts claims that his trial counsel, David Fahrenkamp, did not adequately consult with Spotts regarding the preparation of his defense; did not make an opening statement; did not prepare Spotts to testify at the suppression hearing; and did not present adequate testimony or evidence at the suppression hearing.

■ The Supreme Court has set out the standard that a defendant must meet to prevail on a claim of ineffective assistance of counsel.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The defendant bears the burden of proving both incompetence and prejudice. *Id.* Because we find that Spotts was not prejudiced by the alleged errors of his trial counsel, we need not address whether trial counsel was incompetent.

To meet the prejudice prong of *Strickland*, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Spotts has not met this standard.

■ First, Spotts argues that trial counsel did not maintain regular contact with him prior to trial, and did not devote sufficient time to consultations with him during the trial. Nevertheless, " '[w]e know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel.' " *United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir.1988) (quoting *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir.1986)). Spotts fails to explain how the lack of consultation affected the outcome of the trial. Spotts's conclusory allegations regarding the time spent in consultation with his trial counsel do not show that he was prejudiced at trial, and thus his ineffective assistance of counsel claim must fail. *See United States v. Goudy*, 792 F.2d 664, 672 (7th Cir.1986); *cf. United States v. Ray*, 828 F.2d 399, 420–21 (7th Cir.1987), *cert. denied*, —— U.S. ——, ——, 108 S.Ct. 781, 1233, 98 L.Ed.2d 867,

---

15. The government, however, does refer to federal law in its brief, albeit incorrectly. (The government erroneously asserts that although federal law governs, the failure to knock and announce is not grounds for suppressing other-

wise lawfully seized evidence under federal constitutional and statutory standards.) Nevertheless, because Spotts did not raise this argument before the district court or on appeal, we will not consider it.

99 L.Ed.2d 432 (1988) (three petitions for certiorari denied).

■ Likewise, the mere fact that counsel did not make an opening statement is not sufficient for a defendant to prevail on a claim of ineffective assistance. Whether to make an opening statement to the jury is at the discretion of trial counsel. *Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir. 1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985). Spotts has not indicated any possible prejudice resulting from his attorney's trial strategy.

■ Spotts also complains that trial counsel failed to adequately prepare him to testify at the suppression hearing. Nevertheless, Spotts did testify at that hearing. Once again, Spotts fails to indicate how additional preparation would have enhanced his testimony. Therefore, this claim also must fail. *See id.* at 586 (defendant will not prevail on ineffective assistance of counsel claim merely by alleging that counsel failed to prepare defendant to testify; defendant must also show prejudice). The test is not whether the defendant was fully satisfied with defense counsel.

Finally, Spotts argues that Fahrenkamp was ineffective in representing him at the suppression hearing. Spotts claims that a Florida attorney retained by Spotts, Tom Kurrus, suggested the knock and announce defense to Fahrenkamp, but Fahrenkamp did not follow up on the suggestion. Nevertheless, Fahrenkamp did present the defense at the suppression hearing, with Spotts taking the stand to testify that the officers did not knock and announce before entering the Alachua stash house. Spotts claims that his fiancee, who was also present at the time of the search, could have corroborated Spotts's testimony. Spotts claims that even though Fahrenkamp knew well in advance of the hearing that Spotts's fiancee could corroborate his story, Fahrenkamp did not ask that she be present to testify at the suppression hearing. Spotts also claims that Kurrus compiled depositions of "key witnesses of the police 'knockdown' team who preformed [sic] the raid." Although it is unclear from

Spotts's brief who these witnesses are or what the depositions say, Spotts claims that the depositions are favorable to his case. Spotts asserts that although Fahrenkamp knew that the depositions existed, he made no use of them at the suppression hearing.

■ Spotts appears *pro se* on appeal. We will construe a *pro se* appellant's brief liberally. *McCottrell v. EEOC,* 726 F.2d 350, 351 (7th Cir.1984); *see Glick v. Gutbrod,* 782 F.2d 754, 755 n. 1 (7th Cir. 1986). Reading Spotts's claims broadly, Spotts may be claiming that Fahrenkamp not only failed to use corroborating testimony at the suppression hearing, but failed to interview the corroborating witnesses or review their depositions. We have held that trial counsel who fails to interview potential witnesses or follow up on substantial leads may be deficient. *See, e.g., Montgomery v. Petersen,* 846 F.2d 407 (7th Cir.1988); *Sullivan v. Fairman,* 819 F.2d 1382 (7th Cir.1987); *Crisp,* 743 F.2d 580. Nevertheless, because Spotts relied solely on Florida law in his motion to suppress, no amount of preparation on that issue by his attorney would have resulted in the district court granting the motion. Therefore, even if Spotts's counsel did not perform in a constitutionally adequate manner, the outcome of Spotts's trial was not affected.

■ Perhaps a better argument would be that Spotts's trial counsel was ineffective because he failed to argue the federal knock and announce standard. Spotts, however, does not raise this argument, and thus we will not consider it. *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 438 (7th Cir.1987), *cert. dismissed,* — U.S. —, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); *United States v. Binder,* 794 F.2d 1195, 1203 (7th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 234, 93 L.Ed.2d 159 (1986). *See Walsh v. Mellas,* 837 F.2d 789, 799–800 (7th Cir.1988) (failure to press an argument either before the district court or on appeal results in waiver); *see also United States v. Brown,* 739 F.2d 1136, 1144–45 (7th Cir.) (appellate court may refuse to consider an ineffective assistance of counsel claim if the claim was not first raised before the

district court and the record on appeal is not sufficient for the court to rule on the merits of the claim), *cert. denied,* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984). Therefore, because none of the alleged errors of trial counsel affected the outcome of the trial, Spotts's claim of ineffective assistance of counsel must fail.

## III. CONCLUSION

After carefully considering the points raised by defendants Mealy and Spotts, we find that all of their claims either lack merit or, in any event, any error that may have occurred was harmless.

AFFIRMED.