**UNITED STATES of America, Plaintiff,**

v.

**Fadi B. HADDAD, Defendant.**

**No. 91–CR–118.**

United States District Court,
E.D. Wisconsin.

Sept. 10, 1991.

John E. Fryatt, U.S. Atty. by Steven M. Biskupic, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

Dennis P. Coffey, Atty. Gen., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

On April 23, 1991, the defendant in the above-captioned action was charged in a single-count indictment with having knowingly and intentionally attempted to possess with intent to distribute approximately one kilogram of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2. A jury trial was commenced on July 1, 1991; the jury returned a verdict finding the defendant guilty as charged in that portion of the indictment. The indictment also included a forfeiture provision for three of the defendant's automobiles alleged to have been involved in the offense charged in the indictment, *see* 21 U.S.C. § 853(a). By stipulation of the parties, the jury did not consider the forfeiture question; the factual and legal questions on the forfeiture question were to be resolved by the court.

The defendant has filed the following post-trial motions and papers: a motion for judgment of acquittal (with supporting memorandum of law), a motion for a new trial (with supporting memorandum of law), a memorandum of law in opposition to the forfeiture provision contained in the indictment, and a motion to dismiss the criminal forfeiture portion of the indictment or, in the alternative, to require the government to elect between criminal or civil forfeiture of the automobiles. The motions for judgment of acquittal and for a new trial will each be denied. In addition, judgment of forfeiture will be entered with respect to the three automobiles, and the motion to dismiss the forfeiture portion of the indictment will be dismissed as moot.

### I.

### A.

Before his arrest, the defendant was employed as a part-time bartender at Colombo's Restaurant in Milwaukee, Wisconsin. From information provided by an informant (identified as James Jackson), law enforcement officers came to suspect that the defendant was doing business as a cocaine "broker." On February 27, 1991, Charles Unger, an undercover task force officer working with the Drug Enforcement Administration (DEA), was introduced to the defendant at Colombo's; the two discussed and negotiated a cocaine transaction for later that evening. According to the terms of that transaction, the defendant was to supply Agent Unger with a kilogram of cocaine in return for $25,000. When the defendant called Agent Unger to complete the transaction, Agent Unger was unable to go forward; the two agreed to meet the next day to try again.

On February 28, 1991, at the designated location (a Denny's Restaurant in Milwaukee), Agent Unger and the defendant again met. Together, they drove in the defendant's BMW automobile first to a service station in Milwaukee where the cocaine was to have been delivered, then to another location, and waited for the cocaine suppliers. In the interim, the defendant had sought to contact the intended suppliers, who, possibly detecting a "bust," never showed up. Like the first, this transaction was never completed.

During their brief acquaintance, Mr. Haddad and Agent Unger remained in contact through the defendant's mobile telephone and telephone-accessed "paging" devices ("beepers") that each carried. On one occasion, the defendant invited Agent Unger to purchase a lesser amount of cocaine—two ounces. Agent Unger purported to be disinterested in a less sizable transaction than that originally negotiated, and he declined the defendant's invitation. By April 12, 1991, Agent Unger and the defendant had arranged another one-kilogram cocaine transaction. Under the terms of that transaction, Agent Unger was to pay $28,000 for the kilogram.

The defendant told Agent Unger that, for this transaction, he had looked beyond Milwaukee to a different "source city" for cocaine: Chicago. The defendant arranged the transaction with Agent Unger as follows: the defendant would receive $28,000 in cash from Agent Unger in Milwaukee, travel to Chicago and purchase the cocaine with $25,000 of that cash, and then return

to Milwaukee (within three hours) with the cocaine and deliver it to Agent Unger. However, Agent Unger expressed some reservations about that arrangement; he claimed to be uneasy handing over—"fronting"—that amount of cash to the defendant before the cocaine was delivered. The defendant proposed a solution to Agent Unger's professed problem: he would tender three of his automobiles as "collateral" for the cash.

On April 13, 1991, the defendant asked Agent Unger to meet him at the Denny's Restaurant to complete their transaction. The two met there in the early evening. The defendant feared detection by law enforcement officers and had Agent Unger drive around the parking lot to check out the area. Agent Unger told the defendant that he had $28,000 in cash: a box represented to contain $25,000 and a roll of cash represented to contain $3,000. The defendant identified one of the three automobiles that would serve as collateral—a Volkswagen GTI parked in the lot. The defendant then tendered to Agent Unger the titles to that vehicle and two others, his BMW and a Cadillac, neither of which were present. After the defendant took the cash, Agent Unger gave the "bust" signal to surveiling DEA Agents, who arrested Mr. Haddad. Also arrested at the scene was Ali Charri, the driver of the Volkswagen parked on the lot.

When the defendant and Mr. Charri were arrested, the DEA agents invited their cooperation in apprehending the would-be cocaine suppliers. Mr. Charri voluntarily identified John Leydon, who was said to be in Chicago with the cocaine supplier awaiting the defendant's arrival with the cash. Mr. Leydon was unaware that the defendant and Mr. Charri had been arrested and were in police custody and had been repeatedly paging the defendant on a telephone-accessed "beeper" carried by Mr. Haddad. Eventually, the agents arranged for Mr. Charri to respond with a telephone call to Mr. Leydon in Chicago. During the Charri–Leydon telephone conversation, Mr. Leydon disclosed that the cocaine suppliers were angry because Mr. Haddad had not yet arrived with the cash. Mr. Charri told

Mr. Leydon that something had come up and that the cocaine deal would have to be postponed.

### B.

The evidence left little doubt that the defendant was an active participant in the April 13, 1991, attempted cocaine deal with Agent Unger that ended in his arrest. At trial, the government endeavored to show that Mr. Haddad's participation in the cocaine deal was knowing and intentional. Conversely, the defendant claimed that he had been "entrapped" into performing the criminal conduct with which he was charged.

The evidence that was probably the most damaging to the defendant very likely came from his own mouth. During the trial, Agent Unger testified that he had secretly recorded his conversations with the defendant during which the two arranged for their cocaine deals. Two such recorded conversations were made part of the record. As the government contended, the defendant's demeanor during these secretly recorded conversations demonstrated that he was not inexperienced in the cocaine trade. Indeed, the fair import of the conversations was that the defendant was an enterprising and ambitious cocaine broker.

Furthermore, when Mr. Haddad testified at trial, the prosecutor questioned him on his personal finances. The evidence proffered by the government suggested that the defendant was possessed of personal wealth in excess to his lawful (and relatively modest) personal income. The defendant testified that he had two jobs and was a hard-worker. Nevertheless, when confronted with his bank records, he struggled to explain how the nature of activity in his bank accounts—large cash deposits made at close intervals—permitted a legitimate explanation. The prosecutor was able to provide the more logical explanation: that portion of the defendant's income was derived from his involvement in the cocaine trade. Moreover, the prosecutor demonstrated that during two months preceding

his arrest the defendant had, on his mobile telephone, made an impressive number of calls—75 in all—to persons who were identified as cocaine suppliers (Phillip Burns and Raymond Rivera).

This evidence undercut the defendant's claim that he had been entrapped by Agent Unger—that he had no predisposition to participate in such a cocaine transaction. More significantly, this evidence, when coupled with the undisputed evidence of the defendant's active involvement in arranging the April 13, 1991, transaction with Agent Unger, enabled the jury to shed any reasonable doubt that Mr. Haddad was guilty of attempting to possess with intent to distribute cocaine.

The jury found the defendant guilty as charged.

## II.

The defendant has filed a motion for judgment of acquittal pursuant to Rule 29, Federal Rules of Criminal Procedure. He was convicted of having knowingly and intentionally *attempted* to possess with intent to distribute approximately one kilogram of cocaine. In his motion, he claims that "the Government failed to prove beyond a reasonable doubt that 'an attempt' took place and that the entrapment defense presented, as a matter of law, requires the entry of a judgment notwithstanding the verdict." Defendant's Memorandum in Support of Motion for Judgment of Acquittal at 2. The motion will be denied.

## A.

Under 21 U.S.C. § 841(a)(1), it is unlawful for any person knowingly and intentionally to possess with intent to distribute cocaine. However, it is also unlawful knowingly and intentionally to *attempt* to possess with intent to distribute cocaine, *see* 21 U.S.C. § 846 ("[a]ny person who attempts ... to commit any offense defined in [the relevant subchapter of Title 21] shall be subject to the same penalties as those prescribed to the offense ..."). The defendant was charged under § 841(a)(1) by way of § 846.

The court instructed the jury that the government was obligated to prove the following two elements beyond a reasonable doubt: (1) that the defendant acted with the intent to possess cocaine and with the intent to distribute it; and (2) that the defendant engaged in conduct that constituted a "substantial step" toward the commission of the attempted offense. As the jury was further instructed, a "substantial step" is defined as an act "strongly corroborative of the firmness of the defendant's criminal intent," *see United States v. Valencia*, 907 F.2d 671, 683 (7th Cir.1990); *United States v. Green*, 511 F.2d 1062, 1072 (7th Cir.), *cert. denied*, 423 U.S. 1031, 96 S.Ct. 561, 562, 46 L.Ed.2d 404, 405 (1975). *See also United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir.1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

The defendant does not contend that these instructions were incorrect. Instead, he claims that the government failed to prove that he took a substantial step toward the commission of the attempted offense; therefore, it failed to prove the offense of attempt. That is, he fashions his motion for judgment of acquittal as an attack of the sufficiency of the evidence upon which his conviction was based.

■ However, to the extent that he claims that the evidence was insufficient to support his conviction, his motion for judgment of acquittal must be denied unless the relevant evidence, when viewed in the light most favorable to the government, could not have permitted a jury finding that the defendant was guilty beyond a reasonable doubt. *See, e.g., United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir.1990); *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989). *See also United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (test is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). This is a "heavy burden." *United States v. Lamon*, 930 F.2d 1183, 1190 (7th Cir.1991).

■ A review of the evidence demonstrates the reasonableness of the jury's verdict. The nature and depth of the nego-

tiations between the defendant and Agent Unger allow no reasonable doubt that the defendant acted with the intent to possess with intent to distribute cocaine. Similarly, from a review of the record it certainly would *appear* that the defendant took a "substantial step" toward the commission of the attempted offense: he took what he thought to be $28,000 in cash from Agent Unger. However, the defendant contends that what would *appear* to be a "substantial step" was not—because the record is insufficient to establish that any cocaine was "actually available" to be purchased with Agent Unger's cash.

Viewed in the light most favorable to the government, the evidence readily demonstrates that cocaine was available—in Chicago—and that the defendant had made arrangements with one John Leydon to purchase it after he took the cash from Agent Unger. The fact that Mr. Leydon called the defendant that night to caution him that the Chicago suppliers were angry with his failure to appear with the cash removes the government's explanation of the defendant's intended conduct from the realm of supposition to the realm of the reasonable inference, *cf. United States v. Cea,* 914 F.2d 881, 889 (7th Cir.1990). Accordingly, the court has no difficulty labeling the defendant's act of taking the cash from Agent Unger a "substantial step" strongly corroborative of his intent to possess with intent to distribute cocaine. *See Valencia,* 907 F.2d at 685 n. 19 (collecting illustrative cases). The judgment of conviction for the offense of attempt is fully supported by the evidence.

## B.

■ The defendant also contends that his motion for acquittal should be granted because his entrapment defense was established as a matter of law. A review of the record, however, demonstrates that the defendant's entrapment defense presented a sharply disputed factual issue. The success of that defense turned on the jury's assessment of, among other things, the defendant's credibility.

While the defendant testified at trial that he would not have engaged in his unlawful attempt to possess cocaine had he not been urged and prodded by Agent Unger, the government proffered abundant conflicting evidence—including the defendant's own (recorded) statements to Agent Unger, suspicious mobile telephone use, and inexplicable personal income—to demonstrate that the defendant was predisposed to arrange a cocaine deal.

It is well-settled that the court may not intrude upon "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences [from the evidence]." *United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir.1986); *United States v. Hagan,* 913 F.2d 1278, 1291 (7th Cir.1990). The jury was instructed on the entrapment issue; it was exclusively for the jury to decide, based upon the conflicting evidence, whether Mr. Haddad was predisposed to commit the crime with which he was charged. They resolved the matter against the defendant. The court has no reason to upset that decision.

## III.

The defendant has contemporaneously filed a motion for a new trial, pursuant to Rule 33, Federal Rules of Criminal Procedure. He states four grounds in support of his motion: (1) that the court erred when it denied his motion in limine seeking to exclude testimony relating to a conversation between Ali Charri and John Leydon after the defendant and Mr. Charri had been arrested; (2) that the court erred when it allowed the government to introduce evidence relating to a conversation between the defendant and Tony Walls occurring after the defendant had been arrested; (3) that the court erred when it denied the defendant's motion for a mistrial when the government argued in its rebuttal closing statement that Mr. Haddad was given the opportunity to become an informant but had refused to do so; and (4) that the court erred when it refused to give the defendant's proposed jury instructions attempting to define "reasonable doubt" and identifying the inferences that may be

drawn from a "missing witness." The motion will be denied.

### A.

Before trial, the defendant filed a motion in limine seeking "an order directing that the United States Government not elicit from any witnesses testimony relating to a conversation occurring on April 13, 1991 with Ali Charri and John Layden [sic] participating, with [DEA Agent] Kelly Snyder overhearing...." As grounds for that motion, the defendant asserted that the telephone conversation took place after his arrest, that he did not participate in the conversation, and that he was not aware of the content of the conversation. The defendant suggested that the admission of statements made during the telephone conversation would be hearsay and would violate his sixth amendment right to confront witnesses against him. The motion was denied.

At trial, the government successfully argued that the challenged out-of-court statements were not inadmissible "hearsay" but rather "admissions" by coconspirators of the defendant, as those terms are defined in Rule 801(d)(2)(E), Federal Rules of Evidence. Under Rule 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is treated as an "admission" by the party—and not as hearsay. Because the defendant was not charged with a substantive conspiracy count, the conspiracy question related simply to the admissibility of the challenged statements as evidence of the defendant's attempt to possess cocaine.

Under Rule 104(a), before the government could proffer those statements, it was obligated to satisfy the court that it was more likely than not that the foundational prerequisites enumerated in Rule 801(d)(2)(E) were present. *See United States v. Martinez de Ortiz*, 907 F.2d 629, 631 (7th Cir.1990) (en banc) (Rule 801(d)(2)(E) admissibility question is resolved by the court on a preponderance of the evidence standard), *cert. denied,* —— U.S. ——, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). The pertinent testimony was provided by Ali Charri, who described the events on the evening of April 13, 1991.

Mr. Charri testified that while he and the defendant were in Milwaukee, John Leydon was in Chicago with the cocaine supplier awaiting the defendant's arrival with $25,-000 in cash. The telephone conversation between him and Mr. Leydon occurred after he and the defendant had been arrested. Mr. Leydon was unaware that the defendant and Mr. Charri were then in police custody. From Chicago, he had been repeatedly attempting to page the defendant on the defendant's "beeper." The challenged statements occurred during the telephone conversation that took place when Mr. Charri returned Mr. Leydon's call, at the urging of the arresting DEA agents. At that time (so far as coconspirator Leydon knew), the planned cocaine purchase was on course. During the brief conversation, as Mr. Charri related it, Mr. Leydon notified him that the cocaine suppliers were angry and asked Mr. Charri why the defendant had not arrived with the cash.

Based upon the evidence, the court found it more likely than not that the defendant, Mr. Charri, and Mr. Leydon were coconspirators in a joint venture to purchase cocaine in Chicago and deliver it to Agent Unger in Milwaukee. Examining the content of the statements themselves, the court found convincing evidence of the *existence* of the unlawful joint venture to possess and distribute. *See Bourjaily v. United States*, 483 U.S. 171, 180, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987) ("there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy"); *United States v. Zambrana*, 841 F.2d 1320, 1344 (7th Cir.1988) (court may consider the content of the statement itself when determining the admissibility of the statement under Rule 801(d)(2)(E)).

Moreover, that evidence was corroborated by *other* evidence of joint membership in a criminal misadventure such as (1) Agent Unger's testimony that the defendant had identified Chicago as the location of his cocaine supplier (and had made ar-

rangements to travel there on the evening of his arrest); and (2) other testimony simply that Mr. Leydon had made repeated calls from Chicago to the defendant on the evening the cocaine deal was to be made. *Cf. Martinez de Ortiz,* 907 F.2d at 633; *United States v. Brown,* 940 F.2d 1090, 1093 n. 2 (7th Cir.1991). On this record, the court was satisfied that the three intended to associate themselves in a scheme to accomplish a common unlawful end. *See, e.g., United States v. Sullivan,* 903 F.2d 1093, 1098–99 (7th Cir.1990) (discussing elements of substantive charge of conspiracy).

The court was also satisfied that the challenged statements, which constituted an admission of unlawful *conduct* on the part of all coconspirators, were made "during the course and in furtherance of" the conspiracy. The court was not impressed with the defendant's contention that the conspiracy automatically terminated with his and Mr. Charri's arrest. At the time of the conversation, Mr. Haddad was not cooperating with the police; unarrested coconspirator Leydon remained at large, poised to complete his designated task in the conspiracy, and ostensibly awaiting guidance or further instruction from the defendant. *See United States v. Mealy,* 851 F.2d 890, 901 (7th Cir.1988) (upholding district court's decision to admit under Rule 801(d)(2)(E) over the defendants' hearsay objection secretly taped statements between arrested coconspirators and unarrested coconspirators).

Specifically, statements about "such topics as selling the [cocaine], *arranging delivery and payment,* reassuring each other of trustworthiness, and *discussing the current status of the conspiracy* and the government's investigation" made during a telephone conversation between arrested and unarrested coconspirators have been viewed as "in furtherance of" the conspiracy, *see Mealy,* 851 F.2d at 901 (emphasis added). *See also United States v. Harris,* 542 F.2d 1283, 1301 (7th Cir.) (even post arrest statements may be "during and in furtherance of" the conspiracy), *cert. denied sub nom. Clay v. United States,* 430

U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). Under *Mealy,* because Mr. Leydon's statements—in particular his inquiry regarding the arrival of the defendant and the cash—were made to "arrang[e] delivery and payment [and to] discuss[ ] the current status of the conspiracy," they were found to have been made "in furtherance of" the conspiracy.

█ In his present motion, the defendant renews his contention that Mr. Charri was acting as a government informant, and that "a person cannot conspire with a government informant who secretly intends to frustrate the conspiracy," citing *United States v. Lively,* 803 F.2d 1124, 1126 (11th Cir.1986). He further contends that unarrested coconspirator Leydon was not in a position to carry out the goal of the conspiracy once the defendant and Mr. Charri were arrested, which distinguishes his case from *Mealy.*

Neither of these contentions convinces the court that its ruling was incorrect. The defendant's focus upon Mr. Charri is misdirected. Even if Mr. Charri could then be viewed as a government informant, *his* out-of-court statements during that conversation were not offered for their truth; only Mr. Leydon's statements were. Moreover, Mr. Charri did little more than respond to the anxious inquiry of coconspirator Leydon. The focus should be upon Mr. Leydon, who, during the conversation, had no idea that Mr. Charri or the defendant had been arrested and were in custody. For purposes of Rule 801(d)(2)(E), the conspiracy remained alive as long as the out-of-court declarant—Mr. Leydon—remained at large, capable of obtaining the cocaine (the goal of the conspiracy), and unaware that his coconspirators were in custody.

The court remains convinced that the challenged statements were made "during the course and in furtherance of" a conspiracy, and were admissible under Rule 801(d)(2)(E). Moreover, to the extent that the statements are within the ambit of Rule 801(d)(2)(E), their admission posed no violation of the confrontation clause of the sixth amendment, *see Bourjaily v. United*

*States,* 483 U.S. 171, 183–84, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987).

### B.

■ The defendant also contends that the court erred when it allowed the government to introduce evidence of a recorded conversation between the defendant and Tony Walls occurring after the defendant had been arrested. The defendant's contention is basic: such evidence was not relevant, and even if it was, its probative value was substantially outweighed by the danger of unfair prejudice. *See* Rules 401 and 403, Federal Rules of Evidence.

There is no dispute that the conversation was initiated at the request of DEA Agents. Nor is there any dispute that the conversation showed both the defendant and Mr. Walls to have a preexisting relationship and at least some common interest in the cocaine business—although during the recorded conversation Mr. Walls manifested some degree of confusion with what the defendant was trying to tell him.

Such evidence became relevant in this case when the defendant asserted his entrapment defense. Evidence that the defendant and Mr. Walls were conversant in the unlawful business of cocaine distribution had at least some tendency to show that it was more probable that the defendant was predisposed to attempt to possess cocaine, *see* Rule 401. Notably, the defendant has never identified with any particularity the danger of *unfair* prejudice that called for the exclusion of this otherwise relevant evidence under the balancing standard of Rule 403.

With or without the defendant's guidance on the matter, the court has no reason to believe that the jury made any improper use of this evidence. Accordingly, the court remains satisfied that the admission of the evidence was the proper exercise of its discretion under Rule 403.

### C.

■ The defendant next contends that the court erred when it denied his motion for a mistrial after the government argued in its rebuttal closing statement that the defendant was given the opportunity to become an informant but had refused to do so. The defendant urges that the government prosecutor "overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense," citing *Berger v. United States,* 295 U.S. 78, 84, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935).

The court finds the defendant's characterization to overstate the significance of the government's comment; hence, *Berger* is inapposite, and a mistrial was unwarranted. At worst, the government's comment was irrelevant to the defendant's guilt or innocence and unrelated to any evidence adduced during the trial. Having reviewed the matter in light of the entire record, which was otherwise untainted, the court is firmly convinced that the comment had absolutely no effect—improper or otherwise—on the jury, *cf. United States v. Adamo,* 882 F.2d 1218, 1234 (7th Cir.1989).

### D.

Finally, the defendant contends that the court erred when it refused to give the defendant's proposed jury instructions (1) attempting to define "reasonable doubt" and (2) identifying the inferences that may be drawn from a "missing witness."

■ At trial, the defendant conceded, as he must, that the court should not attempt to define the nebulous term "reasonable doubt" for the jury. *See, e.g., United States v. Glass,* 846 F.2d 386, 387 (7th Cir.1988). Under *Glass* (and its progeny), it is "inappropriate" for judges to attempt to explain the term "reasonable doubt" because the attempt does not usually result in making the matter clearer to the minds of the jury. *See also United States v. Braxton,* 877 F.2d 556, 563 (7th Cir.1989). I am confident that Mr. Haddad's learned counsel was fully aware of the case law on this topic, but he was raising the objection "for the record," as was his right. In any event, the court is satisfied that the combination of the words "reasonable" and "doubt" creates a term possessed of an

intrinsic and elemental meaning—and readily within the ken of the jury.

■ Also at trial, the defendant identified James Jackson as an ostensible "missing witness," and requested that the court instruct the jury that the defendant was entitled to certain favorable inferences that may have explained Mr. Jackson's absence, *see* § 3.25, Federal Criminal Jury Instructions of the Seventh Circuit (West 1980). The request was denied. The court has no doubt that its ruling that the prequisites for that instruction were not established was correct. *See* Committee Comment to § 3.25, Federal Criminal Jury Instructions of the Seventh Circuit (West 1980) (citing *United States v. Mahone*, 537 F.2d 922, 926 (7th Cir), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976)).

The government was not shown to have any peculiar power—either physically or pragmatically—over Mr. Jackson. *See Mahone*, 537 F.2d at 926. To the contrary, the government suggested that it was in no better of a position than the defendant to cause Mr. Jackson to appear. (The defendant does not disclose whether *he* subpoenaed the witness.) Because the defendant failed to demonstrate that the so-called "missing witness" was under "unusual government control," it was not error to refuse to give the instruction, *see United States v. Romo*, 914 F.2d 889, 893 (7th Cir.1990).

### IV.

The criminal forfeiture provision of the indictment, under the authority of 21 U.S.C. § 853, seeks the forfeiture of three automobiles owned by the defendant: a 1984 Volkswagen with vehicle identification number 1VWDC0179EV015527; a 1979 BMW automobile with vehicle identification number 5449803; and a 1979 Cadillac with vehicle identification number 6S69B99496963.

Originally, the jury would have considered the forfeiture question, after—and only if—it determined that the defendant was guilty of the offense charged in the indictment. After the jury's guilty verdict was read in open court, however, the defendant (without an objection by the government) waived his right to a jury trial on the forfeiture question. Subsequent court proceedings were then suspended, and it was agreed by the parties that the court would determine the forfeiture question. The parties were to submit stipulated findings of fact, which they have not. In the absence of the requested stipulation, the court has resolved the forfeiture question solely on the evidentiary record developed during the trial of the substantive count of the indictment. The court will order the defendant to forfeit the automobiles identified in the indictment and will direct the clerk to enter judgment accordingly.

### A.

The criminal forfeiture statute, 21 U.S.C. § 853, imposes a weighty penalty on those who employ their personal property in a drug transaction. In pertinent part, the statute provides that

> Any person convicted of a violation of [any section of either subchapter of Title 21 (Drug Abuse Prevention and Control)] punishable by imprisonment for more than one year *shall* forfeit to the United States, irrespective of any provision of State law—
>
> .    .    .    .    .
>
> (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation....

21 U.S.C. § 853(a) (emphasis added). The language of § 853(a)—"shall forfeit"—is mandatory. *United States v. Vriner*, 921 F.2d 710, 712 (7th Cir.1991).

■ Under § 853, forfeiture is a consequence of conviction. *See United States v. Simone*, 931 F.2d 1186, 1199 (7th Cir.1991); *see also United States v. Herrero*, 893 F.2d 1512, 1541 (7th Cir.) (upholding the constitutionality of § 853), *cert. denied*, — U.S. ——, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990). Once the defendant has been convicted, he (with his property) is subject to criminal forfeiture proceedings in which the government is required "to make its

proof by only a preponderance of the evidence." *Simone*, 931 F.2d at 1199.

In this case, the defendant has been convicted of having knowingly and intentionally attempted to possess with intent to distribute approximately one kilogram of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Under § 841(b)(1)(B)(ii)(II), applicable where the violation of § 841(a) involves 500 grams or more of a mixture containing cocaine, the *minimum* permissible punishment upon conviction is five years imprisonment. *See also* 21 U.S.C. § 846 (persons who attempt to commit any criminal offense defined in Title 21 are subject to the same penalties as those prescribed to the offense that was attempted).

Thus, the defendants' conviction brings the three subject automobiles named in the forfeiture provision of the indictment within the purview of § 853(a). To obtain the defendant's automobiles by forfeiture under § 853(a), the government must prove it more likely than not that the defendant used any or all of these automobiles "in any manner or part ... to facilitate the commission" of his attempt to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

### B.

■ On the record created during the trial, the court is satisfied that the government has met its evidentiary burden. To begin with, the court is satisfied that the physical transfer of the titles to those three automobiles from the defendant to Agent Unger was an act sufficient to accord the defendant notice that he had involved that property in his attempted cocaine transaction. Moreover, the evidence conclusively demonstrated that the defendant provided Agent Unger with the titles to the three identified automobiles as collateral to ensure that Agent Unger would advance the $28,000 cash.

The transfer even of unsigned titles to automobiles located elsewhere is one *manner* in which a cocaine transaction may be facilitated. The title transfer *facilitated* the defendant's attempt to possess with intent to distribute cocaine because, by overcoming Agent Unger's professed financial distrust, it enabled the defendant to have access to the cash he needed to fund his intended purchase of cocaine from his Chicago supplier. In fact, the evidence demonstrated that the defendant needed nearly all of that cash to effectuate his attempt to purchase (and thereby attempt to possess) the underlying one kilogram of cocaine. Without the automobiles as collateral, there would have been no cash advance. Without the cash advance, there would have been no trip to Chicago to purchase the cocaine.

Accordingly, the court is convinced that the three automobiles were used to facilitate the defendant's attempt to possess with intent to distribute cocaine; the defendant will be directed to forfeit those automobiles to the government.

### ORDER

Therefore, IT IS ORDERED that the defendant's motion for judgment of acquittal be and hereby is denied.

IT IS ALSO ORDERED that the defendant's motion for a new trial be and hereby is denied.

IT IS FURTHER ORDERED that the defendant be and hereby is directed to forfeit to the government the three automobiles named in the forfeiture provision of the indictment (a 1984 Volkswagen with vehicle identification number 1VWDC0179EV015527; a 1979 BMW automobile with vehicle identification number 5449803; and a 1979 Cadillac with vehicle identification number 6S69B99496963) for disposition in accordance with 21 U.S.C. § 853(h).

IT IS FURTHER ORDERED that the clerk of court be and hereby is directed to enter judgment of forfeiture of the three automobiles named in the forfeiture provision of the indictment (a 1984 Volkswagen with vehicle identification number 1VWDC0179EV015527; a 1979 BMW automobile with vehicle identification number 5449803; and a 1979 Cadillac with vehicle identification number 6S69B99496963) con-

currently with the imposition of sentence upon the defendant.

IT IS FURTHER ORDERED that the defendant's motion to dismiss the criminal forfeiture portion of the indictment or in the alternative to require the government to elect between criminal forfeiture and civil forfeiture be and hereby is dismissed as moot.