**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Fadi B. HADDAD, Defendant–Appellant.**

No. 91–3194.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1992.

Decided Oct. 2, 1992.

Chris R. Larsen, Steven M. Biskupic (argued), Asst. U.S. Attys., Office of U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Dennis P. Coffey, Michael J. Fitzgerald (argued), Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant-appellant.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Defendant Fadi B. Haddad appeals his conviction on a single-count indictment charging him with knowingly and intentionally attempting to possess with intent to distribute approximately one kilogram of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. We affirm.

*Background Facts*

On April 23, 1991, a grand jury returned a single-count indictment charging Haddad with knowingly and intentionally attempting to possess with intent to distribute approximately one kilogram of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2. A jury trial was held from July 1, 1991 to July 3, 1991. The jury returned a verdict of guilty. 773 F.Supp. 1184. Since one of the issues raised on appeal is whether the government proved the charged offense with sufficient evidence we review the facts of the case in some detail.

Prior to the events testified to at trial Fadi Haddad was a 24–year–old bartender at a tavern called Colombo's in Milwaukee, Wisconsin. One of his co-workers was James Jackson, a government informant. On February 27, 1991, James Jackson introduced Haddad to Charles Unger, who was working undercover as a member of a Drug Enforcement Administration task force. Arrangements were made for Haddad to meet Unger and Jackson at a tavern in West Allis, Wisconsin, and supply Unger with one kilogram of cocaine for $25,000. Haddad did not appear. After Haddad did not show up, Unger sent Jackson to Colombo's. Jackson talked with Haddad and informed Unger that Haddad wanted to see cash before he would set up any transaction. Unger then went to see Haddad at Colombo's to display cash to Haddad.

Jackson contacted Haddad the following day, February 28, 1991. Haddad, Jackson and Unger then met at Denny's Restaurant. Unger believed the transaction was to take place at Denny's; however, Haddad advised him that his contacts who were supposed to supply the cocaine would not come to the restaurant. Unger explained that he did not want to meet Haddad's people and that he wanted to stay at Denny's. Haddad then told Unger about a friend who had "bugged him about something like this for a long time." (Presumably Haddad meant a cocaine transaction.) Finally, Haddad told Unger, "We did the connection, the first time is always hard, the hardest thing." Haddad also told Unger he had been burned before. The parties arranged another rendezvous location.

The parties went to a gas station on 55th and North where Unger testified that Haddad's source supply was to meet him, but when they arrived Haddad pulled up along side Unger's car and told Unger and Jackson they had to go to North and Lisbon. They travelled seven blocks to that location and waited. Eventually Unger testified he got tired of waiting for the deal to go through. He contacted Haddad the next day to find out what the problem was. Haddad told Unger he never got in contact with his source. After Haddad revealed he was having trouble getting in contact with his source, Unger attempted to make an arrangement for a one kilogram exchange to occur at what Unger purported to be his residence at 102nd and Lincoln. Haddad did not appear to make the exchange.

Then on March 15, 1991, Unger received a page on his electronic pager from Haddad. Unger testified that Haddad offered to sell him two ounces of "the finest" cocaine. Unger replied that he had no interest in such a small amount. Unger told Haddad he would possibly get together with him later, but the two never met. Subsequently, Unger went to Colombo's with another undercover agent to pay Haddad a social visit and have some cocktails. The two men did not talk specifically about drug transactions.

On April 1, 1991, Haddad contacted Unger at approximately 11:30 in the morning. At Haddad's request, Unger went to meet him at Auto Stereo where Haddad was employed. Haddad told Unger he had been in contact with a supplier of cocaine in Chicago. Haddad said that he could get a kilogram of cocaine if Unger gave him the money up front. Unger replied that if he was going to put up $25,000 he needed some collateral. Since Haddad had mentioned he owned ten cars, Unger asked for keys and titles to five of Haddad's vehicles. Haddad agreed.

Haddad next contacted Unger on April 12, 1991. Unger and Haddad met at Denny's Restaurant. Haddad informed Unger that he was ready to go through with the deal at any time. Haddad also informed Unger that the price for a kilogram of cocaine would be $28,000. Unger did not want to make the exchange that day because he needed time to set up surveillance. The following day after Haddad tried to reach Unger several times by pager, Unger and Haddad arranged a meeting for 6:30 p.m. at Denny's Restaurant. Haddad and a friend, Ali Charri, met Unger in the parking lot of Denny's. They were driving a rented car. Haddad supplied Unger with titles to three automobiles, a BMW, a Cadillac and a Volkswagen GTI. After receiving the titles, Unger stepped to the rear of his automobile and took out a box which Haddad was led to believe contained $25,000 in cash. Unger gave this box to Haddad. Unger then took out a roll of money from his pocket which Haddad was led to believe was approximately $3,000 in cash. He gave the roll of money to Haddad. Haddad took the money and went to his car. Haddad and Charri were then arrested.

After his arrest, Charri agreed to place a police-monitored call to John Leydon, Haddad's supplier of cocaine in Chicago. Leydon had been repeatedly paging Haddad, after Haddad was arrested. Charri called Leydon and told him that he and Haddad would not be able to make it to Chicago. Leydon replied that the suppliers in Chicago were angry with the delay and the deal would have to be canceled. While Charri was making the phone call, Haddad was being questioned. Haddad told DEA officers that his source of cocaine was a man named Tony in Milwaukee. He agreed to set up an immediate meeting with Tony for the agents to record. However, when Tony arrived he did not have a kilogram of cocaine for sale. Instead Tony said he thought Haddad was going to supply the cocaine.

At trial Haddad testified he became involved in the transaction with Unger only because the government informant, Jackson, kept badgering him. He also testified he had no additional experience in drug trafficking prior to being contacted by Jackson. Haddad then testified that the only reason he knew what to do in his February 28th meeting with Unger was by following the instructions of a restaurant customer named Phil, who appeared to Haddad to be a person "on drugs," and Phil's friend, Ray. Haddad also testified that he gave the name "Tony" to the agents questioning him because he was nervous and because he wanted to avoid trouble for his friend Leydon. Haddad said he had no conversations with Tony concerning cocaine deals prior to the April 13th meeting Haddad set up with government agents.

On cross-examination the government confronted Haddad with his own recorded statements concerning his experience in negotiating prior drug transactions. The government also demonstrated that Haddad's contacts with Phil (Burns) and Ray (Rivera) went back to December of 1990, well before Haddad's negotiations with Unger which began in February of 1991. The government additionally showed Haddad had a number of unexplained cash deposits in his checking account during the time he was attempting to sell cocaine. And finally, the government introduced a tape-recorded, post-arrest conversation between Haddad and Tony during which Haddad referred to prior drug transactions between the two men.

*Analysis*

The first issue Haddad raises on appeal is whether the trial court correctly admit-

ted statements made over the telephone by John Leydon to Ali Charri, after Charri and Haddad were arrested. Haddad argues the trial court erred in admitting the statements because the government did not establish the existence of the conspiracy and because the government did not establish that the conversation was in furtherance of any conspiracy.

■ Federal Rule of Evidence 104(a) requires a district judge to determine whether co-conspirator statements are relevant before they will be admitted. *United States v. Martinez de Ortiz*, 907 F.2d 629, 632 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). Additionally, Federal Rule of Evidence 801(d)(2)(E) provides for the admissibility of co-conspirator statements at trial if the government establishes by a preponderance of evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy when the statements were made; and (3) the statements were made in furtherance of the conspiracy. *See United States v. D'Antoni*, 874 F.2d 1214, 1217 (7th Cir. 1989). We will not disturb the trial court's decision to admit co-conspirator statements under these three factors unless we find the court's decision to be clearly erroneous. *United States v. Van Daal Wyk*, 840 F.2d 494, 496 (7th Cir.1988).

In a detailed analysis the trial court set out the reasons which it believed supported a finding that a conspiracy existed between Haddad, Charri and Leydon. The trial court relied on Charri's testimony that Leydon was awaiting Charri's and Haddad's arrival with $25,000 when Charri and Haddad were arrested; that Leydon was not aware of their arrest and repeatedly attempted to page Haddad on his beeper; and that when Charri contacted Leydon after Charri's arrest, the planned cocaine transaction was to take place so far as Leydon knew. The court also considered the content of the statements themselves. *See Bourjaily v. United States*, 483 U.S. 171, 180, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987) (stating that a co-conspirator's statements are themselves probative of the existence of a conspiracy). Finally, the court pointed to other evidence of joint membership in a "criminal misadventure" such as Agent Unger's testimony that Haddad identified Chicago as the location of his cocaine supplier. Based on all this evidence the trial court found it more likely than not that Haddad, Charri and Leydon were co-conspirators in a joint venture to purchase cocaine in Chicago and deliver it to Agent Unger in Milwaukee.

■ Moreover, we believe there is ample evidence in the record to support the conclusion that the relationship between Haddad and Leydon was more than a buyer-seller relationship. Evidence of a buyer-seller relationship standing alone is insufficient to support a conspiracy conviction. *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir.1991). The details presented by the government at trial indicated that the relationship between Haddad and Leydon was ongoing and that the parties intended to make cocaine transactions in the future. For example, there was evidence of two months of negotiations between Haddad and Agent Unger with Haddad referring to his cocaine supplier from Chicago (Leydon). And in one transcript of a recorded conversation between Haddad and Agent Unger, Haddad states to Agent Unger that if Agent Unger wanted cocaine sold in the future all Agent Unger had to do was to contact Haddad because Haddad had people in place who would "dump" the cocaine in a day or two. The government speculated at oral argument to this court that perhaps the relationship between the co-conspirators and the unidentified person from whom the co-conspirators obtained a kilogram of cocaine in Chicago (via Leydon) was buyer-seller. But as between Haddad and Leydon, there was ample discussion and activity produced at trial that supported the existence of a conspiracy. Based on our review of the record we are satisfied with the trial court's analysis of the existence of the conspiracy for purposes of the admission of Leydon's statements made to Charri after Charri was arrested.

■ Similarly, we agree with the trial court's discussion of whether the co-conspirator statements were made in furtherance of the conspiracy. Haddad advances an argument that co-conspirator statements are not admissible if the conspiracy ends in failure. Haddad cites an advisory committee note to Rule 801(d)(2)(E) in support of his position. The note provides in relevant part:

> The limitation upon the admissibility of statements of co-conspirators to those made "during the course and in furtherance of the conspiracy" ... is consistent with the position of the Supreme Court in denying admissibility to statements made after the objectives of the conspiracy have either failed or been achieved. (citations omitted).

Haddad says the conspiracy in this case ended when Haddad and Charri were both arrested. Haddad reasons that since Leydon was the only remaining unarrested participant in the conspiracy, he was incapable of carrying out the goals of the conspiracy. Haddad also contends that the conspiracy could not be carried out by Charri, who was acting as a government informant, because a person cannot conspire with a government informant who secretly intends to frustrate the conspiracy. Haddad cites *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir.1986), to support his latter argument.

■ The conspiracy between Haddad, Charri and Leydon was not automatically terminated by Haddad's and Charri's arrest. *See United States v. Mealy*, 851 F.2d 890, 901 (7th Cir.1988). In *Mealy* we said, "a co-conspirator's arrest does not automatically terminate a conspiracy; the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of the partners." *Id.* The trial court found that as long as Leydon remained at large, the conspiracy was alive. The court found further that it did not matter whether Charri was an informant because *his* statements were not being offered as out-of-court statements; rather, the government sought to introduce Leydon's statements, and Leydon had no idea that Charri and Haddad were in custody when Leydon spoke to Charri.

We think the trial court correctly analyzed the issue of whether Leydon's statements were made in furtherance of the conspiracy. Leydon spoke to Charri about the status of the transaction and when Charri and Haddad were going to arrive in Chicago to pick up a kilogram of cocaine. Moreover, while Leydon was talking with Charri about the cocaine transaction, Haddad was attempting to mislead government agents by fingering a person in Milwaukee, Tony, as his supplier of cocaine in an attempt to protect his friend, Leydon. At the time of Charri's phone call to Leydon, Haddad and Leydon were still acting on behalf of the conspiracy, and Leydon's statements to Charri were properly admitted as co-conspirator statements made in furtherance of an existing conspiracy. *See Mealy*, 851 F.2d at 901.

Haddad next contends that the prosecutor in this case made improper rebuttal arguments. Specifically, the prosecutor remarked during closing arguments, "The really sad thing is that this defendant was offered an opportunity ... but he chose not to do that, and he chose to put Tony Walls in a position where he was going to put all the blame on Tony Walls." Haddad claims this comment was an impermissible reference to his failure to exercise his option to become a government informant and a reference to matters outside the record of the trial. Haddad also contends that the comment infringed his rights under the Fifth and Sixth Amendments to the United States Constitution. The trial court found otherwise and stated that at worst the government's comment was irrelevant to the defendant's guilt or innocence, unrelated to any evidence adduced at trial, and had absolutely no affect on the jury.

■ In analyzing cases of prosecutorial misconduct we first look to see if the remark was improper, and then we look to see whether, in light of the entire record, the defendant was deprived of a fair trial. *United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir.1992). The prosecutor's comment was directed toward Haddad's

counsel's comments with regard to Haddad's, as his counsel called it, "screw-up" in fingering Tony as his supplier of cocaine in an attempt to hide Leydon's identity. Haddad's counsel said Haddad's actions were simply evidence of Haddad's inexperience in illegal drug matters. Haddad's counsel also referred to the tragic aspect of the case—that but for Jackson, Haddad never would have been involved in an illegal drug transaction. In light of all the evidence adduced at trial, including Haddad's own testimony, we do not believe the prosecutor's statement made in rebuttal to Haddad's counsel's arguments deprived Haddad of a fair trial. While we agree with Haddad that he was not obligated in any way to make the choice to become a government informant, we think the prosecutor's remark reflected evidence presented at trial and was not impermissible.

In his third contention of error, Haddad relies on our opinion in *United States v. Cea*, 914 F.2d 881 (7th Cir.1990), to support his argument that there was insufficient evidence produced at trial to support his verdict of guilty for the offense of attempting to possess cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. In the *Cea* case the defendant was arrested shortly after leaving his home following a phone conversation with a government agent during which a drug transaction was discussed. However, no specific location for the meeting was arranged, and there was no evidence produced at trial indicating which direction Cea was heading or where in relationship to his home Cea was arrested. Additionally, the *Cea* court pointed out that the government did not even demonstrate whether Cea had the money to complete the purchase. All of these deficiencies supported the *Cea* court's decision to reverse Cea's conviction based on the court's belief that the government failed to establish that Cea had taken a substantial step towards an attempt to possess cocaine with intent to distribute at the time of his arrest. *See Cea*, 914 F.2d at 888–89.

■ Our review of Haddad's challenge to the sufficiency of evidence in this case is whether any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. When conducting this review we view the record in a light most favorable to the government. *United States v. Herrero*, 893 F.2d 1512, 1513 (7th Cir.), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990). To prove Haddad attempted to possess cocaine with intent to distribute, the government must show: (1) Haddad acted with the intent to possess cocaine with intent to distribute; and (2) Haddad engaged in conduct which constitutes a substantial step toward commission of the offense. *See United States v. Valencia*, 907 F.2d 671, 684 (7th Cir.1990).

■ The facts adduced at trial and reviewed above indicate Haddad intended to possess cocaine with the intent to distribute. Agent Unger's testimony of his negotiations with Haddad, as well as Haddad's own testimony at trial, support this conclusion. Similarly, there is ample evidence in the record supporting the conclusion that Haddad took substantial steps toward the commission of the offense. Unlike the circumstances of the *Cea* case where Cea's actions were noted by the court to be ambiguous, this case evidences no similar ambiguity. Haddad told Agent Unger that his supplier of cocaine was in Chicago. Haddad and Charri arrived in a rented car at Denny's Restaurant to meet Agent Unger to pick up money. Haddad and Charri were then planning to travel to Chicago to meet Leydon and make the transaction. As the government points out in its brief the evidence is such that the jury could easily infer that "had Haddad been given $28,000, he was just a drive away from completing the offense."

■ Although Haddad contends he established a defense of entrapment as a matter of law, we believe the jury was entitled to find that the government did not entrap Haddad in this case. A valid entrapment defense has two elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct. *United States v. Jones*, 950 F.2d 1309, 1314

(7th Cir.1991). Entrapment as a matter of law occurs only when the absence of the defendant's predisposition appears from the uncontradicted evidence. *United States v. Kaminski*, 703 F.2d 1004, 1007 (7th Cir.1983). In evaluating whether the defendant had the predisposition to commit the offense, we look to the following factors: (1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced a reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *Jones*, 950 F.2d at 1314 (citing *United States v. Marren*, 890 F.2d 924, 930 (7th Cir.1989)). In *Jones* we said, "The most important factor for the court to focus upon is the defendant's reluctance to commit the offense.... Such reluctance is a good indicator that the government's action motivated the defendant to commit the offense, thereby removing culpability from the defendant." 950 F.2d at 1314.

■ The government produced evidence at trial which more than adequately supports the jury's rejection of Haddad's entrapment defense. As the district court pointed out in its decision, "the fair import of the [secretly recorded] conversations was the defendant was an enterprising and ambitious cocaine broker." Decision and Order, 773 F.Supp. at 1187. Although Haddad had no prior criminal record, we do not think Haddad's lack of predisposition appeared from the uncontradicted evidence in the record. Thus, Haddad did not establish entrapment as a matter of law, and the jury was entitled to reject his entrapment defense.

Finally, Haddad argues the trial court erred in refusing to grant him a two-point reduction under section 3E1.1 of the Sentencing Guidelines for acceptance of responsibility. Haddad argues that the district court should not have denied him the two-point reduction simply because he presented an entrapment defense. Haddad claims that the presentation of an entrapment defense can be viewed as his acknowledgment of his participation in illegal conduct. The district court rejected Haddad's argument, and we affirm the district court's decision.

■ Section 3E1.1(a) of the Sentencing Guidelines reads: "If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by two levels." Since the trial court's evaluation of the defendant's acceptance of responsibility is essentially factual, this court will affirm the trial court's decision unless the decision is clearly erroneous. *See United States v. Blas*, 947 F.2d 1320, 1330 (7th Cir.1991). Unlike Haddad, we believe the trial judge adequately explained the reasons why he denied Haddad a two-level reduction for acceptance of responsibility. The trial judge stated that he appreciated Haddad's contentions regarding his acknowledgement on the stand of his participation in illegal conduct, but the trial judge believed that Haddad's position was also "one of total denial of his obligation in this matter." The trial court also stated that it was Haddad's privilege to take the stance that he did, but the net impact of the stance was that he had not accepted responsibility. We agree.

### Conclusion

Fadi B. Haddad's conviction for attempting to possess cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a) and 846 and the sentence imposed by the district court are·

AFFIRMED.